**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UNITED STATES OF AMERICA,
    Plaintiff,

    v.                                 No. 3:11-cv-0412 (JAM)

GREGORY P. COHAN,
    Defendant.

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This case involves a lawyer who for many years now has not paid his federal student loans. After defendant Gregory Cohan defaulted on his student loans in the early 1990s, he consolidated the defaulted loans into one federal direct consolidated loan—the subject of the current dispute. This loan was payable on an income-contingent repayment plan, whereby the amount of defendant's monthly payments would be based on his annual income. But even after consolidating his loans, defendant still did not make any loan payments and disputed the manner in which the U.S. Department of Education (DOE) calculated his monthly payments. In September 2002, many months after the government declared that payment was due, it declared defendant to be in default. The government accordingly accelerated the repayment schedule, making the full amount of his consolidated loans and accrued interest due and payable immediately. Defendant still declined to pay. The government, as plaintiff in this case, now brings this action to collect the debt. For the reasons set forth below, I now grant the government's motion for summary judgment, and I deny defendant's motion for summary judgment.

### BACKGROUND

Defendant Gregory Cohan received several federal student loans to attend law school at the University of Bridgeport Law School in the late 1980s and early 1990s. After graduating, he

opened his own law practice and worked as a self-employed attorney, but was not making required payments on his student loans.

In August 1999, he signed a promissory note for a federal direct consolidation loan administered by the federal government by which he would repay his earlier loans and be responsible for a new lump sum. This new loan would accrue interest at a rate of 8.25% each year. The promissory note states that its terms "will be interpreted according to the [Higher Education Act of 1965, 20 U.S.C. § 1070 *et seq.*] and other applicable federal statutes and regulations." Doc. #44-13 at 4. The note separately instructs the borrower to "[c]arefully read the repayment plan information . . . that accompanies this application and promissory note to understand your repayment plan options," and then select a repayment plan. *Id.* at 3. Defendant selected the Income Contingent Repayment (ICR) plan.

Under the terms of the ICR regulations, which were explained in a document separate from the promissory note, a borrower's monthly payments would be determined and periodically readjusted based on his income. Specifically, his monthly payment amount would be the lesser of the following two calculations:

> (i) The amount the borrower would repay annually over 12 years using standard amortization multiplied by an income percentage factor that corresponds to the borrower's adjusted gross income (AGI) as shown in the income percentage factor table in a notice published annually by the Secretary in the Federal Register; or
> (ii) 20 percent of discretionary income . . . . defined as a borrower's AGI minus the amount of the [annual] "HHS Poverty Guidelines" . . . .

34 C.F.R. § 685.209(a)(2), (3) (2000); *see also* 20 U.S.C. § 1087e(e) (pocket pt. 1999); Doc. #44-11 at 2 (Direct Loans "Repayment Plan Choices" document). The plan also provided that "[i]f a borrower's AGI is not available or if, in the Secretary's opinion, the borrower's reported AGI does not reasonably reflect the borrower's current income, the Secretary may use other

documentation of income provided by the borrower to calculate the borrower's monthly repayment amount." 34 C.F.R. § 685.209(c)(1); *see also* 20 U.S.C. § 1087e(e)(3) (1999) (providing that the other documentation of income must be "satisfactory to the Secretary"); Doc. #44-11 at 2.

Finally, under the ICR plan, any balance that remained on the loan after the borrower had made payments for 25 years would be forgiven. 34 C.F.R. § 685.209(c)(4)(iv). But any periods during which the loan was in forbearance—when the borrower was not required to make payments for a number of possible reasons—would not count towards that 25-year time limit. *Id.* § 685.209(c)(4)(ii). The regulations also note that any interest that accrued during a period of loan forbearance would be capitalized at the end of that period. *Id.* § 685.205(a).

The note stated that a borrower would be in default if he did not make payments when due, if the nonpayment continues for at least 270 days, and if the government "reasonably concludes [the borrower] no longer intend[s] to honor [his] repayment obligation." Doc. #44-13 at 4. If a borrower were in default, the government might choose to make "the entire unpaid balance . . . immediately due and payable." *Ibid*.

The government made a series of loan disbursements to defendant between November 1999 and April 2000, totaling $97,658.55. In January 2000, the Internal Revenue Service (IRS) reported defendant's 1998 AGI to the DOE as $24,502. Doc. #65-2 at 13. The government began sending defendant monthly bills in early 2000. At defendant's request, the government granted a forbearance until May 2000, during which defendant was not required to make any payments. Then in mid-2000, it began billing defendant again.

On May 18, 2000, defendant mailed the DOE a copy of his 1999 federal income tax return to demonstrate that his "income [was] substantially lower than it was in previous years,"

and asked the DOE to use it to "update the amount of my monthly payments." Doc. #48-5 at 1.

The enclosed tax return demonstrated that defendant reported his 1999 AGI as $9,538.

After the DOE received his letter, it instructed defendant to submit an "Alternative

Documentation of Income" form. The form instructed a borrower to "list all taxable income you

are currently receiving," and noted that "[a]ll income reported . . . must have supporting

documentation (i.e. pay stubs, dividend statements, canceled checks, or, when these forms of

documentation are unavailable, a signed statement explaining your income source(s) and giving

the addresses of these sources) submitted with this application." Doc. #48-6 at 1. The form

further required that "[a]ll supporting documentation must not be more than 90 days old." *Ibid.*

Defendant completed this form on June 15, 2000, although there is no evidence that he submitted

any other documentation at that time. The form was received by the government on June 22,

2000, and a few days later the government billed defendant for a monthly amount of $271.03.

Still, defendant did not pay.

On August 10, 2000, defendant mailed the government a signed letter bearing the

letterhead of his law practice, which stated his business's gross revenue and enumerated

expenses from January 1, 2000, through August 10, 2000. The letter indicated that his net

income was $2,907.09 during that period and asked that the government to "[p]lease adjust my

repayment schedule and my monthly payments accordingly." Doc. #44-6. On August 27, 2000,

the government mailed defendant a monthly bill for $269.20. But defendant still did not pay.

On August 31, 2000, defendant mailed a supplementary letter correcting an error in the

first letter but disclosing the same amount of net income. Later that month, the government

determined that defendant's income was below the poverty line and that he could not afford loan

payments. As a result, without consulting defendant, it applied a retroactive administrative

4

forbearance to defendant's account, adjusting his requested forbearance to end in September 2000, rather than in May 2000. At the end of the forbearance period in September 2000, the government capitalized the accrued interest into the loan principal, and defendant was not required to make monthly payments.

In late 2001, the DOE received updated AGI information from the IRS based on defendant's 2000 tax return. Defendant had reported an AGI of $26,960 on his 2000 tax return which was comprised of two income sources: $7,770 of business income, and $21,739 which he reported as a cancelled student loan. Doc. #44-5 at 1. In November 2001, the government began sending defendant monthly bills for $306.17 based on his 2000 AGI. Again, defendant did not pay and received several past-due notices from the DOE.

In February 2002, defendant began to contact the DOE to dispute the amount he was being charged. During a phone call on February 7, 2002, defendant complained that his 2000 AGI "included student loans that were forgiven" and which should not properly be counted as income for the purpose of his loan repayment calculation. Doc. #66-1 at 4. Government records indicate that the DOE agreed to send defendant alternative income documentation forms and a form to request a forbearance "to clear up past due payments and prevent credit reporting" and explained to defendant on the phone that he should include a "self-cert letter."[1] *Ibid.*

The government continued billing defendant $306.17 each month, and defendant continued not to pay. The government made several collection calls to defendant in March 2002, and government records note that defendant was angry on the phone and "[r]efused available alternatives," including additional loan forbearances. *Id.* at 6–7. During a phone call at the end of March 2002, he again disputed the government's use of the 2000 AGI reported by the IRS, and

---

[1] It is not clear whether the DOE mailed alternative income documentation forms to defendant at that time. *See* Doc. #66-1 at 7.

agreed to send in alternative documentation of his income.

On April 4, 2002, defendant sent a letter to the government on his business's letterhead stating his business revenue and breaking down his business expenses between January 1, 2000, and December 31, 2000, and noting that he had received "$21,739 of debt cancellation." Doc. #44-8 at 2; *see also* Doc. #44-10. He continued to receive monthly bills from the government.

According to government records, later in the month of April, during a phone call between defendant and the DOE, a DOE employee explained to defendant that because defendant was self-employed, the DOE required him to send a monthly breakdown of his income, rather than an annual summary. Defendant "wanted to know who made up that rule" and declined to accept a forbearance in the meantime. Doc. #66-1 at 4.

In September 2002, after months of attempting to collect payments from defendant, the government declared the debt to be in default, and accelerated the payment schedule to make the loan due and payable immediately. On September 26, 2002, defendant received a default notice seeking payment of $121,061.35, equivalent to $111,752.50 of principal and $9,308.85 of interest. Doc. #48-4. Defendant declined to pay.

Many more years elapsed without payment. The government filed this action in May 2011 to collect the debt, alleging that it amounted to $197,692.25 at the time of filing, and would continue to accrue interest at 8.25% per annum until the date of judgment.

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of

material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). The absence of evidence to support the non-moving party's case may allow the moving party to prevail at summary judgment regarding issues on which the non-moving party bears the burden of proof at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986) (discussing the burdens of proof under Fed. R. Civ. P. 56 when the moving party alleges that the opposing party has no evidence to support a claim). To prevail on such issues, the opposing party must present concrete evidence that is not simply based on speculation or conjecture. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008); *United States v. Whittlesey*, 2010 WL 1882283, at *3 (D. Conn. 2010). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

"The Government is entitled to summary judgment if its evidence establishes that [defendant] signed promissory notes, received loans pursuant to these notes, and defaulted on [his] payment obligations," *United States v. Mullaney*, 2010 WL 4681251, at *1 (D. Conn. 2010) (citing cases), and if its evidence supports the amount it alleges is due, *see Chem. Bank v. Geller*,

727 F.2d 61, 64 (2d Cir.) *decision clarified on denial of reh'g*, 734 F.2d 132 (2d Cir. 1984); *Whittlesey*, 2010 WL 1882283, at *2. The government may satisfy its *prima facie* case if it presents a certificate of indebtedness and the promissory note sued upon. *See Whittlesey*, 2010 WL 1882283, at *2.

Here, there is no dispute that defendant signed a promissory note for a Federal Direct Consolidation Loan on August 27, 1999, that he received aggregate loan disbursements of $97,658.55 between November 1999 and April 2000, and that he was to pay according to the ICR plan. The government has set forth a Certificate of Indebtedness providing that an additional "$14,093.95 in unpaid interest was capitalized and added to the principal balance." Doc. #1-1. Defendant has never voluntarily paid any amount towards his loan balance, although the government has credited $63.64 in apparent Treasury Department offsets towards the loan balance. *See id.*

The government concedes that defendant was not required to pay anything until November 2001. Doc. #63 at 7. But defendant argues that at that same time—and perhaps long before—the government committed a material breach of its obligations under the loan agreement by improperly calculating defendant's monthly repayment obligation and billing him accordingly. He believes the government failed to cure its breach, thereby excusing him from his continued contractual obligation to make loan payments.

Under Connecticut law, "a total breach of the contract by one party"—that is, "an uncured material failure of performance"—"relieves the injured party of any further duty to perform further obligations under the contract." *Bernstein v. Nemeyer*, 213 Conn. 665, 672–73, 570 A.2d 164 (1990); *Shah v. Cover-It, Inc.*, 86 Conn. App. 71, 75, 859 A.2d 959 (2004) (emphasis omitted). "[W]hether there has been a *material* breach of a contract"—that is, a breach

8

that "go[es] to the root or essence of the agreement between the parties, or . . . which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract,"—is a question of fact. *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 117 (2d Cir. 2006) (quoting 23 *Williston on Contracts* § 63:3, at 438–39 (4th ed. 2002)); *Independence Ins. Serv. Corp. v. Hartford Life Ins. Co.*, 472 F. Supp. 2d 183, 189 (D. Conn. 2007) (emphasis added) (quoting *Alaimo v. Beacon Indus., Inc.*, 89 Conn. App. 363, 873 A.2d 1015 (2005) (*per curiam*)).

> The following factors are relevant to this determination:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*See Bernstein*, 213 Conn. at 672 n.8 (quoting Restatement (Second) of Contracts, § 241).

Defendant principally claims that the government materially breached the loan agreement when, at the end of 2001, it declined to recalculate defendant's monthly payment based on defendant's alternative documentation of his income, as opposed to his 2000 AGI. After the DOE received defendant's 2000 tax return in October 2001, it resumed billing defendant for monthly payments in excess of $300, based on his reported AGI of $26,960. Defendant called the DOE repeatedly to challenge this calculation, pointing out that his AGI incorporated not only income in the ordinary sense of the word, but also a significant amount of discharged student debt. He attempted to persuade the DOE that, for that reason, his 2000 AGI was not a proper

reflection of his income. In the spring of 2002, defendant submitted alternative documentation of his annual income for the year 2000, but the agency did not use that information to recalculate his monthly payment and continued billing him over $300 each month.

The statute and regulations governing alternative income documentation are broadly drawn and leave much to the DOE's discretion regarding (1) whether defendant's AGI "reasonably reflect[ed]" his current income in late 2001 or early 2002, (2) whether the DOE should consider other documentation of defendant's income, or (3) whether the documentation that defendant submitted was "satisfactory." 20 U.S.C. § 1087e(e)(3); *see also* 34 C.F.R. § 685.209(c)(1). Both parties relied on the regulatory language at oral argument, and based on the governing law section of the promissory note, I find "no serious room for doubt that the [statutory and] regulatory language is incorporated by reference into the promissory note." *Pfeiffer v. Duncan*, 659 F. Supp. 2d 160, 168 n.5 (D.D.C. 2009). Accordingly, the statutory and regulatory language "becomes part of [the] contract for the indicated purposes just as though the words . . . were set out in full in the contract." *Russo v. City of Waterbury*, 304 Conn. 710, 721, 41 A.3d 1033 (2012) (citation omitted). With that in mind, I need only conclude—and I do conclude—that all the evidence indicates that the DOE did receive and examine defendant's submissions, and then exercised its discretion, and defendant has presented no evidence that the DOE abused its discretion when it declined to use the submissions to recalculate defendant's payments.

Defendant also asserts that the government is bound by a document separate from the promissory note, which outlines his Repayment Plan Choices. That document includes a statement regarding alternative income documentation that is similar, but more expansive, than the statute and regulations: "*when* [a borrower's] federal tax return does not reflect [his] present

10

income . . . [he] may submit documentation of [his] *current* income. [His] monthly payment *will be based* on this documented income information." Doc. #44-11 at 2 (emphasis added); *cf.* 34 C.F.R. § 685.209(c)(1); *see also* 20 U.S.C. § 1087e(e)(3). But even if this statement were part of the agreement—a matter I need not resolve—defendant never triggered the government's obligation to consider his documentation because he never provided *current* income documentation in 2002. The Alternative Income Documentation form he submitted on April 4, 2002 specifically required that "all supporting documentation must not be more than 90 days old," and upon submitting that form, defendant also certified that he "underst[ood] that if [he did] not provide this information, the Department will base [his] income contingent repayment amount on [his] AGI, as reported by the IRS . . . ." Doc. #44-10. Rather than documenting his current income from early 2002, defendant listed his income sources from 2000—a period that ended fifteen months earlier. Accordingly, defendant has submitted no evidence to support his contention that the government committed a breach—let alone a material breach—of the contract in 2002 when it declined to determine defendant's monthly payment based on his outdated income documentation, and instead continued to rely on his 2000 AGI.[2]

At oral argument, defendant began to allege an additional series of actions by the government in 2000 that he characterizes as material breaches. Although he failed to make these arguments in his initial motion papers, I will (reluctantly) address them here.[3] Defendant now asserts that the government first materially breached the agreement in mid-2000, when it (1) began sending defendant monthly bills for over $269, after allegedly calculating his income

---

[2] Defendant did not file his 2001 income taxes until at least April 10, 2002, *see* Doc. #44-1 at 2, and the DOE did not receive his 2001 AGI information until October 2002, after defendant had already defaulted on his loan, *see* Doc. #65-2 at 13.

[3] I decline to address defendant's argument regarding any material breach by the government that allegedly occurred after September 2002, because it is not relevant as a defense to this action.

improperly pursuant to the ICR plan, and then (2) subsequently applied an administrative

forbearance without defendant's consent, thereby extending defendant's repayment period and

capitalizing accrued interest.

Under the regulations, in mid-2000, defendant should have owed no more than 20% of

the difference between his AGI and the poverty level for a single person—$8,350 in 2000. *See*

Annual Update of the HHS Poverty Guidelines, 65 Fed. Reg. 7555-01 (Feb. 15, 2000); *see also*

Doc. #44-9. Defendant reported an AGI of $9,538 on his 1999 tax return, which would result in

loan payments of $237.60 annually, or $19.80 each month.[4] *See* Doc. #48-5 at 2. In fact, the

government was billing defendant over $269 each month, based on defendant's reported 1998

AGI. *See* Docs. #48-8, #48-9, #56-1 at 5–6 (indicating that the DOE was relying on defendant's

1998 AGI between January 2000 and August 2000), #65-2 at 13 (same). But even assuming

without deciding that the government's decision to calculate defendant's mid-2000 income based

on his 1998 AGI constituted a breach of the loan agreement, such a breach would have been

cured when, in September 2000, the government began billing defendant $0 and concluded that

defendant was unable to pay his earlier bills from the previous summer, effectively forgiving his

non-payment only a short time later.

Defendant also alleges that the government's decision to apply a retroactive

administrative forbearance constituted an additional material breach because it allowed the

government to extend his repayment term an additional four months, and to capitalize the interest

that accrued during that time into the principal loan balance. But I am not persuaded that this was

a breach at all, much less a material one that caused defendant harm. Indeed, any reasonable

---

[4] The alternative calculation under 34 C.F.R. § 685.209(a)(2)(i) would have resulted in an annual payment of over $7,200 based on defendant's 1999 AGI. *See* Notice of the Annual Updates to the Income Contingent Repayment (ICR) Plan Formula, 65 Fed. Reg. 34006, 34006–07 (May 25, 2000) (indicating that alternative payment is calculated by reference to the loan balance and an income percentage factor table); Doc. #66-1 at 10 (indicating that loan balance was $97,658.55).

debtor would understand a forbearance to be a benefit, not a breach of contract.

Were I to find that this forbearance excused defendant from paying over $100,000 of loan principal that he would have owed at the conclusion of his requested forbearance in May 2000—to say nothing about the substantial amount of interest that has accrued since—the parties' respective losses would be heavily unbalanced, and the government "would suffer a disproportionate forfeiture." *United States v. Abady*, 2004 WL 444081, at *6 (S.D.N.Y. 2004) (rejecting student loan defaulter's argument that he was excused from having to pay his loans because the government did not send him certain monthly invoices and mailing envelopes as required under loan contract).

And defendant has presented no evidence that he agreed to the loan contingent on a strict 25-year repayment term with no possibility of an administrative forbearance. In fact, as the Eleventh Circuit has noted, "[t]he time and amount of the eventual repayment obligation [of federal student loans administered by the DOE] are not conclusively established at the time the student signs the promissory note due to numerous contingencies that are expressly allowed by operation of federal law." *Carter*, 506 F. App'x 853, 858 (11th Cir. 2013). The applicable regulations incorporated into the agreement provide for possible extensions of the 25-year ICR repayment term, and denote the possibility of administrative forbearances. *See* 34 C.F.R. §§ 685.205(b) (administrative forbearances), 685.209(c)(4)(ii) (noting that periods of forbearance are not included in the 25-year repayment period). Accordingly, defendant has presented no evidence that a strict 25-year repayment period was part of the agreement at all, let alone a material term that was breached by forbearance.

Defendant maintained an obligation to repay his student loans, but has never made any payment on his consolidated loan. The government resumed charging him at the end of 2001 and

he persisted in not paying for over 270 days. Moreover, defendant has presented no evidence that he ever attempted to pay what he owed—an act distinct from his attempts to procure what he believed to be an accurate bill. The evidence indicates that defendant first contacted the DOE in February 2002—several months after it had resumed charging him for monthly payments. Government records reveal that over the course of multiple phone calls between the end of 2001 and the end of 2002, defendant was rude, repeatedly declined forbearances that were offered to him, and refused to pay. *See* Doc. #66-1 at 4–7. It wasn't until April 2002 that he attempted to submit any income documentation, and that information was outdated and did not correspond to the form's clear instructions. There is no evidence that defendant ever tried to calculate or pay what he believed he actually owed in 2002.

Defendant has presented no evidence to support his statement at oral argument that the government "made it impossible for [him] to make the payments" or that he was unable to calculate his payments because he lacked access to the Federal Register. Doc. #63 at 35, 48. The Federal Register is a publicly available document, and defendant is and was a practicing attorney. In fact, this debt arises directly as a result of his legal training. And defendant conceded that he "finally went to the law library" to look up federal regulations when he was served with the complaint in this case. *Id.* at 48. He has provided no reason why he could not have done his research and mailed payments many years ago.

Accordingly, it was certainly reasonable for the government to conclude that defendant did not intend to pay, and to find him in default 270 days after payment was due at the end of 2001. For that reason, I find that the government is entitled to summary judgment on its claim of liability for defendant's default.

The government has moved for judgment in the amount of $201,602.84 as of August 17,

2011, the date of its motion, plus interest accruing at a rate of $25.24 until the date of judgment.[5]

Doc. #17-3 at 20. This calculation is adequately supported by the government's Certificate of

Indebtedness, sworn under penalty of perjury. *See* Doc. #1-1.

To the extent that defendant challenges as an element of the asserted damages the

September 2000 capitalization of interest that accumulated during the unwanted administrative

forbearance applied to his account, he has offered no evidence to support his position.[6]

Defendant's requested forbearance ended in May 2000, and he was first billed for payment in

June 2000. But he did not pay, he did not submit adequate alternative documentation of his

income, and he showed no indication that he intended to pay.[7] Even if the government

subsequently relied on defendant's August 2000 alternative income documentation forms to

recalculate his payment obligation to zero—a fact which I need not decide—defendant has

shown no evidence that the government would have been contractually obligated to apply its

recalculation retroactively, zeroing out his payment obligation for the whole summer. In fact,

defendant conceded at oral argument that under the regulations, based on his income at the time,

he should have been making payments. Doc. #63 at 36. That the government chose to apply an

administrative forbearance instead of triggering defendant's default earlier was to defendant's

benefit and not his detriment. And whether defendant wanted a forbearance has no bearing on the

damages assessment, because the government had broad discretion to apply one for innumerable

---

[5] That initial amount represents a principal amount of $111,752.50, plus $83,817.98 of interest that had accrued on December 21, 2010, *see* Doc. #1-1, and $6,032.36 of interest that accrued in the 239 days between December 21, 2010 and August 17, 2011.

[6] I note that defendant has made no counterclaim for breach of contract, and presented this argument only as a complete defense to liability. Nonetheless, I address the argument here as it applies to the government's claim for damages.

[7] On June 15, 2000, defendant submitted a copy of his 1999 tax return to the DOE along with an "Alternative Documentation of Income" form. Doc. #48-6. The DOE received it and responded on June 26, 2000, with a request for supporting documents. Doc. #66-1 at 7. Defendant did not respond again until August. As I discussed above, the DOE had discretion to consider the documents. I conclude that the DOE did receive and examine defendant's submissions and exercise its discretion, and defendant has presented no evidence that the DOE abused its discretion when it declined to use the tax return to recalculate defendant's payments.

15

reasons under 34 C.F.R. § 685.205(b).

As defendant has presented no other evidence to challenge the government's claim for damages, I find that the government is entitled to summary judgment. *See West-Fair Elec. Contractors v. Aetna Cas. & Sur. Co.*, 78 F.3d 61, 63–64 (2d Cir. 1996) (*per curiam*) (affirming award of damages on summary judgment where defendant submitted only "conclusory statements" regarding damage amount); *cf. Schwan-Stabilo Cosmetics GMBH & Co. v. Pacificlink Int'l Corp.*, 401 F.3d 28, 33 (2d Cir. 2005) (reversing award of damages on summary judgment where plaintiff did not seek damages, and defendant was not on notice or given an opportunity to contest damages).

### CONCLUSION

Plaintiff's motion for summary judgment (Doc. #17) is GRANTED. Defendant's motion for summary judgment (Doc. #40) is DENIED. Defendant is liable to plaintiff in the amount of $236,535.00. Following judgment, interest shall continue to accrue pursuant to 28 U.S.C. § 1961.

It is so ordered.

Dated at Bridgeport this 1st day of June 2015.

/s/ ***Jeffrey Alker Meyer*** _____
Jeffrey Alker Meyer
United States District Judge